IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER SANSOM and MARIA )
SANSOM, Husband and Wife, )
                               )
      Plaintiffs, )
                               )    Civil Action No. 2:10-cv-0958
         v. )
                               )    Judge Mark R. Hornak
CROWN EQUIPMENT CORPORATION; )
CROWN LIFT TRUCKS, )
                               )
      Defendants. )

## OPINION

**Mark R. Hornak, United States District Judge**

Before the Court is a Motion for Summary Judgment filed by Defendants Crown Equipment Corporation and Crown Equipment Corporation d/b/a Crown Lift Trucks (collectively "Crown"). ECF No. 63. The Court has considered Crown's (1) Motion, (2) Concise Statement of Material Facts, (3) supporting Brief, and (4) submitted exhibits. ECF Nos. 63, 63-1 through 63-26, 64, 65. Plaintiffs Christopher Sansom and Maria Sansom (collectively "the Sansoms") filed a Response to Crown's Concise Statement of Material Facts with supporting exhibits and a Brief in Opposition to the Motion for Summary Judgment, which the Court has also considered, as well as Crown's Reply to these documents. ECF Nos. 69, 70, 70-1 through 70-24, 71 through 75, 78, 79. The Court heard the parties' positions at oral argument and ordered supplemental briefing to address recent developments in Pennsylvania state law that bear directly on this case, which the parties have completed. ECF Nos. 84, 85. Therefore, this matter is ripe for disposition. For the reasons that follow, Crown's Motion for Summary Judgment is DENIED.

## I.   BACKGROUND

Upon reviewing the record, the Court finds that the following facts are not in dispute. The Sansoms, a married couple, bring a products liability action against Crown, alleging that Mr. Sansom suffered severe injuries resulting from his operation of a defectively designed pallet truck distributed by Crown and that, as a result of Mr. Sansom's injuries, Mrs. Sansom has been deprived of the companionship of her husband. [1]   Compl. ¶¶ 1, 11, 14, 16, 18.   The pallet truck that is the subject of Sansoms' design-defect claim is a Crown Lift Truck Model 30-SP-48TT-360 ("Stockpicker"), serial number 1A182447.   Pls.' Resp. to Defs.' Concise Statement of Material Facts ¶¶ 80-81, ECF No. 69 (hereinafter "Pls.' Stat. Facts"); Defs.' Resp. to Pls.' Concise Statement of Additional Facts ¶¶ 80-81, ECF No. 79 (hereinafter "Defs.' Resp. Facts").

*THE STOCKPICKER'S USES, SPECIFICATIONS, AND SAFETY FEATURES*

The Stockpicker is a powered vehicle that allows its operator to retrieve items from high-level shelving units, such as those common to industrial warehouses.   McDermitt Dep. 21:1-6; Coffin Dep. 12:25-13:8.   It can also serve as an elevated observation platform from which an operator of the Stockpicker can view inventory that is stored on shelves above eye level. McDermitt Dep. 21: 16-23.

To use the Stockpicker, the operator stands on a 4 foot wide by 2.25 foot deep operator's platform (the "platform").   Pls.' Stat. Facts ¶ 84; Defs.' Resp. Facts ¶ 84.   Two forks are connected to one side of the platform (the "load end") and a wooden pallet can be suspended between the two forks (the "load pallet").   Pls.' Stat. Facts ¶ 85; Defs.' Resp. Facts ¶ 85.   Upon the load pallet, a Stockpicker operator may place any number of items, whereby he "picks" inventory and lowers it to the ground from a warehouse's shelves.   McDermitt Dep. 21:1-6;

---

[1] The Sansoms originally also brought various negligence-based claims against the owner of the storage facility where Mr. Sansom was injured, Cortom, LLC.   The Sansoms voluntarily dismissed Cortom from this suit on February 25, 2011. (ECF Nos. 41, 42).

Coffin Dep. 12:25-13:8. To that end, the platform, forks, and load pallet all elevate together to a maximum height of 30 feet so that the operator can reach inventory stored at height. Pls.' Stat. Facts ¶ 84; Defs.' Resp. Facts ¶ 84.

Directly opposite the load end sits the Stockpicker's control panel, which occupies that entire side of the platform. Pls.' Stat. Facts ¶ 85; Defs.' Resp. Facts ¶ 85. Foldable gates stand on the remaining two, parallel sides of the platform. Crown's Concise Statement Material Facts ¶ 8, ECF No. 64 (hereinafter Defs.' Stat. Facts); Pls.' Stat. Facts ¶ 8. These gates are interconnected to the traction system and must therefore be in place before the operator can drive the truck. Defs.' Stat. Facts ¶ 8; Pls.' Stat. Facts ¶ 8. No gate is present on the load end of the platform, nor are there gates or other railings surrounding the load pallet assembly. Defs.' Stat. Facts ¶¶ 1 (image), 9; Pls.' Stat. Facts ¶ 9.

For fall protection, the Stockpicker comes equipped at the time of purchase with a "medium size belt," which is adjustable to between 36 inches and 44 inches, and an eight (8) foot long non-retractable lanyard. Defs.' Stat. Facts ¶¶ 11, 17; Pls.' Stat. Facts ¶¶ 11, 90; Defs.' Resp. Facts ¶ 90. An operator secures the belt around his waist, connecting one end of the lanyard to the belt and attaching the lanyard's opposite end to the Stockpicker's "mast." Defs.' Stat. Facts ¶ 12; Pls.' Stat. Facts ¶ 12. Both the Stockpicker's operator's manual and a conspicuous sign attached to the Stockpicker itself inform potential operators that failure to wear the safety belt could result in injury or death. Defs.' Stat. Facts ¶¶ 19-20; Pls.' Stat. Facts ¶¶ 18-22. Beyond the standard "medium" safety belt, Crown can provide to its customers, upon request, with larger and smaller belt sizes, as well as various other belt configurations, including full body harnesses and self-retracting lanyards. Defs.' Stat. Facts ¶¶ 10, 28; Pls.' Stat. Facts ¶¶ 26-28.

3

Crown designed the subject Stockpicker's belt and lanyard system to meet domestic industry standards.  Defs.' Stat. Facts ¶ 17; Pls.' Stat. Facts ¶ 17.  Crown also distributes stockpickers to other parts of the world, and these models may possess different safety features. Of import to the parties' arguments on summary judgment are two particular Crown stockpicker types: a European model and an Australian model.  The European version, which Crown has manufactured and sold since the early 1970's, comes equipped with a fully enclosed operator's platform; specifically, a "rear lifting gate" spans the load end, which eliminates the full, open space between the load pallet and the platform. Pls.' Stat. Facts ¶¶ 94, 96; Defs.' Resp. Facts ¶¶ 95, 96. The Australian model, which the Sansoms' expert, Mr. George Wharton, P.E., examined, also possessed a gate across the load end and was further described as a "North American truck to which rear gates had been added for shipment to Australia." Wharton Prelim. Exp. Rep. 12-13.

*MR. SANSOM'S ACCIDENT AND CROWN'S REPORTS OF OTHER STOCKPICKER ACCIDENTS*

On the day of his accident, November 29, 2007, Mr. Sansom was using the subject Crown Stockpicker to review inventory for his employer, Great Lakes Cold Storage ("Great Lakes").  He admits to not wearing the safety belt and lanyard, asserting that the only belt available would not fit over the bulky clothing worn by Great Lakes' employees, necessary to withstand the freezing warehouse conditions. Defs.' Stat Facts ¶ 44; Pls.' Stat. Facts ¶¶ 43-44. Shortly after 1:00 p.m., Mr. Sansom stood on the operator's platform at an elevation of 15 feet while he checked on a warehouse shelf that contained a load of soup. Defs.' Stat. Facts ¶¶ 49-50; Pls.' Stat. Facts ¶¶ 48-52. The Stockpicker stood parallel to the shelving rack at a distance of approximately four (4) inches.

4

Mr. Sansom then observed another employee driving a different piece of machinery between the same aisles where he stood on the Stockpicker. Realizing that the other employee did not see him, Mr. Sansom braced himself for a potential collision by holding onto a portion of the Stockpicker comprised of steel wire mesh[2] with one hand while repeatedly honking the Stockpicker's horn with the other. Pls. Stat. Facts ¶¶ 53-57. The two vehicles collided, and the force of the impact threw Mr. Sansom from the platform. His body travelled through the open load end of the operator's platform, hit the load pallet, flipped over the pallet's edge, and landed on the floor. *See* Defs.' Stat. Facts ¶¶ 55-56; Pls.' Stat. Facts ¶¶ 53-57. Mr. Sansom was knocked unconscious and sustained a fracture in his right leg; the severity of the fracture later necessitated the partial amputation of this leg. Defs.' Stat. Facts ¶ 57; Pls.' Stat. Facts ¶¶ 53-57.

Crown produced 125 accident reports during discovery that detailed circumstances where other operators suffered injury while using its stockpickers equipped with the belt and lanyard system. Pls.' Stat. Facts ¶¶ 107-08; *See* Defs.' Resp. Facts ¶ 107.[3] These reports covered the years between 1990 and 2007 and contain evidence of eight (8) fatalities and numerous head injuries, skull fractures, back injuries and broken bones. Pls.' Stat. Facts ¶¶ 107-08; Defs.' Resp. Facts ¶¶ 108. The reports showed that in 65% of recorded falls the operators were not wearing the belt and lanyard. Pls.' Stat. Facts ¶ 110; Defs.' Resp. Facts ¶ 107. However, even when the operator was reportedly connected to the tether system, the documentation illustrates that serious injuries, and even fatalities, could and did occur. *See, e.g.,* Pls.' Stat. Facts, Ex. F. 59-60, 67, 79-80.

---

[2] In contrast, Crown states that the wire mesh that Mr. Sansom grabbed for support for the impending collision was attached to the warehouse rack, not the Stockpicker. Indeed, the record is somewhat unclear on this point, but the Court does not find the location of the mesh material to its analysis.

[3] Crown does not appear to dispute that it produced a total of 125 accident reports during discovery, but does contest the import of these reports. *See* Defs.' Resp. Facts ¶ 107.

## II.    LEGAL STANDARD

The purpose of summary judgment is "to dispose of all factually unsupported claims and defenses." *Omnipoint Comm. Enter., L.P. v. Newtown Tp.*, 219 F.3d 240, 242 (3d Cir. 2000). Summary judgment is appropriately granted in favor of the moving party if the movant can demonstrate that no genuine issue of material fact exists, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a). Accordingly, to survive a motion for summary judgment, the non-movant must establish that there is indeed a genuine issue of material fact, which requires the action to proceed to a trier of fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An issue is "genuine" only if it would prevent a rational factfinder, when viewing the record as a whole, from granting judgment for the moving party. *See id.* at 586. Regarding materiality, the substantive law identifies which facts are "material," meaning only those facts that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Within the framework of Federal Rule of Civil Procedure 56, the moving party must first demonstrate the absence of a genuine issue of material fact by citing to relevant portions of the record, which may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, and interrogatory answers." Fed. R. Civ. Pro. 56(c)(1). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). However, a court is not confined to the cited materials and may consider all materials in the record. Fed. R. Civ. Pro. 56(c)(3). If the movant meets his burden, the non-movant must then point to evidence supporting the existence of a genuine issue of material fact. *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2009). But "[t]he non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the

6

record on which a jury could decide an issue of fact its way." *Id.* The court reviews all evidence in the light most favorable to the non-moving party and draws all justifiable inferences in the non-movant's favor. *Omnipoint Comm. Enter., L.P.*, 219 F.3d at 242 (citing *Anderson*, 477 U.S. at 255); *Matreale v. N.J. Dept. of Military & Veterans Affairs*, 487 F.3d 150, 152 (3d Cir. 2007).

## III.    DISCUSSION

### A.   THE CURRENT STATE OF PENNSYLVANIA PRODUCTS LIABILITY LAW

Crown moves for summary judgment by asking the Court to declare as a matter of law that its Stockpicker is not defectively designed, thereby defeating the Sansoms' products liability action. The substantive law of Pennsylvania applies to this strict products liability claim. 28 U.S.C. § 1332(a)(1) (LexisNexis 2003); *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). Unfortunately, the current state of Pennsylvania products liability law can be described as, at best, unsettled, and, at worst, a maze of uncertainty, providing little guidance to manufacturers as to whether a product's design risks liability under Pennsylvania law or, for the injured, whether the circumstances of an individual case will support a legal remedy for harm caused by a manufacturer's product. The source of this confusion is two-fold. First, the Pennsylvania Supreme Court has not, to date, ruled whether the Restatement (Third) of Torts provides the controlling analysis for products liability claims rather than the analysis under the Restatement (Second) of Torts.[4]   *See, e.g., Schmidt* v. *Boardman Co.*, 11 A.3d 924, 940-41 (Pa. 2011) (acknowledging that "foundational problems" exist in Pennsylvania products liability law based upon the Restatement (Second) of Torts, but

---

[4] While it can be argued that in the absence of a definitive adoption of the Restatement (Third) by the Pennsylvania Supreme Court, the Restatement (Second) applies by default, even a cursory examination of the multiple opinions in *Phillips v. Cricket Lighters*, 841 A.2d 1000 (Pa. 2003), *Schmidt v. Boardman Co.*, 11 A.3d 924 (Pa. 2011) and *Beard v. Johnson and Johnson, Inc.*, 41 A.3d 823 (Pa. 2012), demonstrates that drawing that conclusion is also fraught with peril, given the *Phillips* and *Beard* courts' candid recognition of the fundamental doctrinal uncertainty in this area of the law, and as seen in *Schmidt*, a willingness to engraft onto more traditional Restatement (Second) analysis legal concepts akin to those applied under the Restatement (Third).   841 A.2d at 1012 (Saylor, J., concurring); 11 A.3d at 940; 41 A.3d at 836.

noting that the case before the Court was not selected to address these "foundational concerns");

*Phillips v. Cricket Lighters*, 841 A.2d 1000, 1012 (Pa. 2003) (Saylor, J., joined by Castille, J. and

Eakin, J., concurring) (advocating adoption of the Restatement (Third) and opining that it

represents "a synthesis of law derived from a reasoned, mainstream, modern consensus"). The

question of which Restatement governs is important because the Restatement (Third) differs

notably from its predecessor by integrating certain negligence concepts into its analysis.

Restatement (Third) of Torts, Products Liability § 1 cmt. a. In contrast, Pennsylvania's product's

liability structure under the Restatement (Second) forbids a court to consider negligence

principles. *Carrecter v. Colson Equipment Co.*, 499 A.2d 326, 330 (Pa. Super. Ct. 1985)

(quoting *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 900 (Pa. 1975)).

Second, even if the Restatement (Second) of Torts governs, the Pennsylvania Supreme

Court has acknowledged that the over forty years of case law interpreting this Restatement,

beginning with *Azzarello v. Black Brothers Co.*, 391 A.2d 1020 (Pa. 1978), has culminated in a

products liability schema that is "almost unfathomable." *Schmidt*, 11 A.3d at 940 (citing to

James A. Henderson, Jr. & Aaron D. Twerski, *Achieving Consensus on Defective Product

Design,* 83 Cornell L. Rev. 867, 897 (1998)). *See also Beard v. Johnson and Johnson, Inc.*, 41

A.3d 823, 836 (Pa. 2012) (recognizing the "continuing state of disrepair in the area of

Pennsylvania strict-liability design defect law").

Overlaying this uncertainty are the Third Circuit's recent decisions holding that district

courts must apply the Restatement (Third) to design defect claims arising under Pennsylvania

law, absent a clear and contrary holding from the Pennsylvania Supreme Court. *See Covell v.

Bell Sports, Inc.*, 651 F.3d 357, 360 (3d Cir. 2011); *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38,

53-54 (3d Cir. 2009), *cert. denied*, 130 S.Ct. 553 (2009). When the Pennsylvania Supreme

8

Court, as the highest court in the Commonwealth, speaks on a particular point of Pennsylvania law, its "pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited, or restricted." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940). However, if the Pennsylvania Supreme Court is silent regarding a state law issue, a federal court must predict how that Court would resolve that issue. *See Holmes v. Kimco Realty Corp.*, 598 F.3d 115, 118 (3d Cir. 2010). To do so, a federal court must look to the holdings of the state's lower courts and accord their decisions due deference. *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir. 1996). If the federal court issuing the prediction is a court of appeals, the district courts within the circuit must apply its predictive holding to legal questions arising under that particular state law "unless the state supreme court issues a contrary decision." *Largoza v. Gen. Elec. Co.*, 538 F.Supp. 1164, 1166 (E.D. Pa. 1982).

The Third Circuit provided such a prediction regarding the path of Pennsylvania products liability law in *Berrier v. Simplicity Manufacturing., Inc.* 563 F.3d at 53-54. The *Berrier* court was presented with the issue of whether, under Pennsylvania law, the Restatement (Second) or (Third) of Torts governed the potential imposition of liability on distributors for injuries to unintended users of their products. *Id.* The unintended user, or "bystander," in that case was a minor child who suffered injuries when her leg was caught under a riding lawn mower. *Id.* at 41. The Third Circuit concluded, after a review of Pennsylvania appellate decisions regarding bystander liability, particularly Justice Saylor's concurrence in *Phillips v. Cricket Lighters,* 841 A.2d 1000 (Pa. 2003), that the Pennsylvania Supreme Court would adopt Sections 1 and 2 of the Restatement (Third) of Torts to determine whether an injured, unintended consumer could recover from the product's distributor. *Id.* at 49-54. Accordingly, since the district court limited

9

its summary judgment analysis to intended users under the Restatement (Second), the *Berrier* court remanded the case so that the district court could consider any reasonably foreseeable user pursuant to the Restatement (Third). *See id.* at 60-61. The Third Circuit thus directed district courts in this Circuit to apply the Restatement (Third) of Torts in cases that require the application of Pennsylvania products liability law. *See id.* at 57.

Nearly two years later, the Pennsylvania Supreme Court took note of the prevailing difficulties in the products liability arena. *See Schmidt v. Boardman Co.*, 11 A.3d 924, 940 (Pa. 2011). In *Schmidt*, Justice Saylor pointed to the need to settle the inconsistencies in Pennsylvania products liability law, but declined to rule directly on the issue by concluding "[t]his case was not selected to address the foundational concerns, and, accordingly, the pathways to global resolution are not developed in significant detail in the briefing." *Id.* at 941. Therefore, the *Schmidt* court could "do little more than to remark that difficulties persist and to proceed to address the specific questions presented with them . . . in mind." *Id.* (emphasis added). The court also took note of the Third Circuit's prediction in *Berrier*, but stated that the "present status quo in Pennsylvania entails the continued application of Section 402A of the Restatement Second . . . ." *Id.*

Six months after *Schmidt* was decided, when faced with the question as to whether a district court properly admitted certain evidence and instructed a jury pursuant to the Restatement (Third) of Torts in a diversity suit involving the alleged defective design of a bicycle helmet, the Third Circuit concluded that the "state of [Pennsylvania products liability law] is no different now than it was when we decided *Berrier*." *Covell v. Bell Sports, Inc.*, 651 F.3d 357, 360 (3d Cir. 2011). The *Covell* court reiterated that "federal district courts applying Pennsylvania law to products liability cases should look to sections 1 and 2 of the Restatement

(Third) of Torts." *Id.* at 359. Accordingly, the Third Circuit affirmed the district court's

decision to utilize the Restatement (Third) and, in doing so, instructed district courts to rely upon

the Restatement (Third) when analyzing issues relating to allegedly defective products under

Pennsylvania law. *See id.* at 358, 363.[5]

Since *Covell*, the Pennsylvania Supreme Court had the opportunity to conclude this

judicial volleying in *Beard v. Johnson and Johnson, Inc.* 41 A.3d at 823. Writing for the *Beard*

court in March 2012, Justice Saylor again recognized the "continuing state of disrepair in

Pennsylvania strict-liability design defect law." *Id.* At 836. However, notably absent in *Beard*

is any determination, holding or even persuasive *dicta* clearly and directly contrary to *Covell*

regarding the applicable law governing Pennsylvania products liability cases. *See, generally, id.*

The *Beard* appellee did invite the court to adopt the Restatement (Third) of Torts, but the court

did not accept or decline that invitation. *Id.* Thus, given that the Pennsylvania Supreme Court in

*Beard* did not affirmatively disavow the premise of the *Covell* decision, along with the principle

that the Third Circuit's predictions regarding Pennsylvania state law are binding on this Court

---

[5] After the Third Circuit's decision in *Berrier*, but before Judge Aldisert's opinion for that Court in *Covell*, district courts in this circuit were split on whether to apply the Restatement (Second) or (Third) of Torts and the principles set forth therein. *Compare Covell v. Bell Sports, Inc.*, No. 9–2470, 2010 WL 4783043, at *4 (E.D.Pa. Sept. 8, 2010) (Diamond, J.) (applying *Berrier*); *Hoffman*, 694 F.Supp.2d 359, 365 (E.D. Pa. 2010) (Tucker, J.) (same); *Richetta v. Stanely Fastening Sys., L.P.*, 661 F.Supp.2d 500, 507 (E.D.Pa. 2009) (Golden, J.) (same), *with Thompson v. Med–Mizer, Inc.*, No. 10–cv–2058, 2011 WL 1085621, at *7 (E.D.Pa. Mar.21, 2011) (Gardner, J.) (court not bound by *Berrier*); *Sweitzer v. Oxmaster, Inc.*, No. 09–5606, 2010 WL 5257226, at *5 (E.D.Pa. Dec. 23, 2010) (Pratter, J.) (same); *Milesco v. Norfolk Southern Corp.*, No. 1:09–CV–1233, 2010 WL 55331, at *3, *6 (M.D.Pa. Jan. 5, 2010) (Jones, III, J.) (rejecting application of *Berrier*). Even since *Covell*, a division remains. *Compare Giehl v. Terex Utilities*, No. Civ. A. 3:12–0083, 2012 WL 1183719, at *9 (M.D. Pa. Apr. 9, 2012) (Caputo, J.) (applying *Covell*); *Shuman v. Remtron, Inc.*, No. 04–cv–00003, 2012 WL 315445, at *9, n.10 (M.D. Pa. Feb. 1, 2012) (Smyser, M.J.) (adopting *Covell*), *with Carpenter v. Shu's Bees, Inc.*, No. Civ. A. 10–0734, 2012 WL 2740896, at *1 (E.D. Pa. July 9, 2012) (Perkins, M.J.) (court not bound by *Covell*); *Sikkelee v. Precision Automotive Corp.*, No. 4:07–cv–00886, 2012 WL 2552243, at *9 (M.D. Pa. July 3, 2012) (Jones, III, J.) (same). Other courts within the circuit, while noting the unclear state of the law, have not been required to rule definitively on the question. *See Westfield Ins. v. Detroit Diesel Corp.*, No. 3:10–cv–100, 2012 WL 1611311, at *7 (W.D. Pa. May 8, 2012) (Gibson, J.); *Davis v. Lowe's Home Centers, Inc.*, No. Civ. A. 09–5367, 2011 WL 3862192, at *2, n.2 (E.D. Pa. Sept. 1, 2011) (Hey, M.J.); *Pennsylvania Trust Co. v. Dorel Juvenile Group, Inc.*, No. Civ. A. 07–4029, 2011 WL 3740472, at *1 (E.D. Pa. Aug. 25, 2011) (Schiller, J.). Absent the most express, crystal clear current and post-*Covell* affirmation of an obligation to look only to the Restatement (Second) by the Pennsylvania Supreme Court, this Court believes, as a matter of judicial hierarchy, that it is obligated to rely upon the Third Circuit decisions of *Berrier* and *Covell* and apply the Restatement (Third).

absent a decision of the Pennsylvania Supreme Court expressly to the contrary, this Court must and will apply the Third Circuit's *Covell* prediction and rely upon Sections 1 and 2 of the Restatement (Third) of Torts here.   Nevertheless, in light of the uncertainty permeating Pennsylvania products liability law, the Court will also examine the application of the Restatement (Second) as if it were to govern the issue of defective design in this case.   For the reasons stated below, the result is the same.

B.  *UNDER THE RESTATEMENT (THIRD) OF TORTS AND RELEVANT PRECEDENT, GENUINE ISSUES OF MATERIAL FACT EXIST SUCH THAT A REASONABLE JURY COULD FIND THAT CROWN'S STOCKPICKER IS DEFECTIVELY DESIGNED*

Crown argues in support of its Motion for Summary Judgment that its Stockpicker is not defective in design because the belt and lanyard system provides adequate fall protection for Stockpicker operators.   The Sansoms disagree and respond, in essence, that the Stockpicker is defectively designed because it lacks a fully enclosed platform, and the tether system alone is insufficient to protect operators from injury.

Under the Restatement (Third), strict liability attaches to a commercial seller of a product that inflicts harm on a person because of a design defect. *Berrier*, 563 F.3d at 54 (quoting Restatement (Third) of Torts § 1).   "One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." *Id.*  Whether or not a particular design is defective under the Restatement (Third) depends, in relevant part, upon whether the foreseeable risks of harm from the product could have been reduced or avoided by the distributor's adoption of a reasonable alternative design.   Restatement (Third) of Torts, § 2(a).   Furthermore, the absence of such a design alternative must render the product "not reasonably safe." *Id.*  In other words, a plaintiff cannot prevail in imposing strict liability on the distributor if the proposed design

12

merely makes an already safe product slightly safer. *See id.* This inquiry into the alleged defectiveness of a product's design centers on the state of the product at the time of sale.[6] *Id.* § 2.

Accordingly, to establish a prima facie case of design defect under the Restatement (Third), a plaintiff bears the burden of proving that a reasonable alternative design was, or reasonably could have been, available at the time of sale. *Id.* § 2, cmt. d. "[T]he test is whether a reasonable alternative design would, at reasonable cost, have reduced the foreseeable risks of harm posed by the product and, if so, whether the omission of the alternative design by the seller . . . rendered the product not reasonably safe."[7] *Id.* A plaintiff need not produce a prototype of the reasonable alternative design, but he may rely on credible expert testimony that the alternative design could have been practically adopted at the time of sale, even where the expert itself has not produced a prototype. *Id.* § 2, cmt. f; *see Hoffman*, 694 F. Supp. 2d at 365-66. Expert testimony is not required in cases where the feasibility of the reasonable alternative design is obvious and understandable to laypersons. Restatement (Third) of Torts § 2, cmt. f.

Regarding the foreseeable risk of harm from the product's intended use, the Court concludes that a jury could find, based upon the record evidence, that Crown could have foreseen that a Stockpicker operator could suffer serious or even fatal injury by falling through the open load end of the platform, regardless of whether such operator was wearing the safety belt and

---

[6] The Restatement (Third) of Torts recognizes that product sellers may be subject to liability even if a reasonable alternative design did not exist at the time of sale. *See* Restatement (Third) of Torts § 2, cmt. e. However, in that instance, a plaintiff must prove that the product design was "manifestly unreasonable" (i.e., the product had such low social utility coupled with a high degree of danger that the absence of a reasonable alternative design would not obstruct a plaintiff from obtaining relief). *Id.*

[7] This standard is markedly different than that prescribed under the Restatement (Second) of Torts § 402A. As other courts in this circuit have noted, "[the Restatement (Second)] standard focuses on an intended user making an intended use of the product, [whereas the Restatement (Third)] focuses on the foreseeable risks of harm and whether an alternative design could have minimized or eliminated that risk." *Giehl v. Terex Utilities*, No. 3:12-0083, 2012 WL 1183719, at *7 (M.D. Pa. April 9, 2012) (quoting *Hoffman v. Paper Converting Mach. Co.*, 694 F. Supp. 2d 359, 365 (E.D. Pa. 2010)).

lanyard. The Sansoms and their expert note that Crown produced 125 accident reports involving the subject Stockpicker that spanned from 1990 to 2007. Included in these reports are multiple instances of fatalities, skull fractures, back injuries, and broken bones incurred by operators falling from the Stockpicker's platform. Pls.' Stat. Facts ¶¶ 107-08; Defs.' Resp. Facts ¶ 108. Operators suffered serious injuries even when they utilized the tether system, and indeed, in one instance, the belt itself caused severe damage to an operator's pelvic area. Wharton Supplemental Ex. Rep. 4, ECF No. 70-13. Given that Crown (1) documented instances of Stockpicker operators suffering injury due to falls whether or not the tether system was in place, and (2) the obvious proposition that an operator can more easily fall through an un-gated side of a platform compared to a gated one, the Court concludes that a rational jury could find that Crown could reasonably have foreseen the danger posed by the open load end of the Stockpicker's platform.[8]

Moving to the existence of a reasonable alternative design, the Sansoms not only provide the Court with such a design but also emphasize that this design was extant at the time of the subject Stockpicker's sale. In fact, Crown has manufactured and sold this alternative stockpicker for its European market for approximately forty (40) years and continues to do so to this day. The European design comes equipped with full perimeter guarding, or, in other words, gates and railings that surround and completely enclose the operator's platform. This includes a rear gate that spans the load end, dividing the end of the platform from the beginning of the load pallet. The European version also has anchor points where a belt and lanyard system could be attached.

---

[8] Furthermore, on an ancillary yet related matter, a rational jury could conclude that Crown could also have foreseen that Stockpicker operators would not wear, either by choice or inability to do so, the standard medium-sized belt and lanyard provided with the Stockpicker at time of purchase. The majority of the accident reports, and particularly the fatalities, occurred when the operator did not wear the belt and lanyard. While in certain circumstances an operator's decision not to wear the tether system may entitle Crown to a verdict on the issue of causation, evidence of a trend of operators disregarding the Stockpicker's safety precautions also weighs in favor of establishing that those precautions are defective. That is, by any measure, a genuine issue of material fact.

By possessing both a belt and lanyard system and full perimeter gating, the European version is, overall, a facially safer product than the Stockpicker at hand.  Such improved safety is due to rear gate's ability to stop an operator's from falling through the load end of the platform before the operator's body accelerates the full length of the eight (8) foot tether and culminates in a jarring stop.  A rational jury could conclude that absent the rear gate, the Stockpicker is not reasonably safe because, as noted above, the open load end poses a serious risk of harm to Stockpicker operators.

Crown does not dispute that it has manufactured and sold the European design for several decades but rather advances several arguments that go to the reasonableness of their decision to decline to equip the subject Stockpicker with a rear gate.  Specifically, Crown argues that the subject Stockpicker is not defectively designed, in part, because it conforms to domestic industry standards, as opposed to the European version, which must meet the more stringent standards of those countries.  Under the Restatement (Third), a product's compliance with trade standards is admissible evidence of the reasonableness of the product's current design in that such standards make it "more probable" that "all possible care was exercised in the preparation and marketing of the product." *Covell*, 651 F.3d at 366-67 (quoting Fed. R. Evid. 401 and Restatement (Third) or Torts § 2(a)).  However, the fact that the Stockpicker conforms to domestic industry standards does not automatically cleanse the Stockpicker of any alleged design defect.  And, most importantly, Mr. Wharton examined a model of Crown stockpicker that in all other respects was designed to meet American trade standards, except that it possessed a fully enclosed platform perimeter.  This model was described to Mr. Wharton as "a North American truck to which rear gates had been added for shipment to Australia."  Wharton Prelim. Ex. Rep. 12, 16, ECF No. 70-2.  The existence of such a simple, single modification to an American-standardized stockpicker

directly raises a question of material fact for the jury regarding the evidentiary value of industry standards in this case.

Finally, Crown itself admitted that an addition of a rear lifting gate to U.S. models would be both "economically and technologically feasible" and, in fact, currently offers such modifications on request from American employers. Defs.' Resp. Facts ¶¶ 116, 118. In sum, applying the test articulated by the Restatement (Third) of Torts for imposition of strict liability for an alleged design defect, the Court holds, after reviewing the evidence in a light most favorable to the Sansoms, that genuine issues of material fact exist whereby a rational jury could properly find that the Stockpicker is defectively designed.

C. *UNDER THE RESTATEMENT (SECOND) OF TORTS AND RELEVANT PRECEDENT, THE STOCKPICKER IS UNREASONABLY DANGEROUS AS A MATTER OF LAW*

Over forty years ago, the Pennsylvania Supreme Court adopted Section 402A of the Restatement (Second) of Torts. *Azzarello*, 391 A.2d at 1023 (citing *Webb v. Zern*, 220 A.2d 853 (Pa. 1966)). This provision imposes strict liability upon sellers of defective products that are "unreasonably dangerous to the user or consumer." Restatement (Second) of Torts § 402A(1) (1965). *See also Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 538 (3d Cir. 2007).

The foundational case that sets forth Pennsylvania's analytical framework under Section 402A is the Pennsylvania Supreme Court's decision of *Azzarello v. Black Brothers, Co. See, generally*, 391 A.2d 1020. The *Azzarello* court, concerned that juries would force suppliers to also be insurers of their products in every circumstance, created a framework whereby the initial decision to expose a distributor of an allegedly "unreasonably dangerous" product to strict liability rests with the trial judge. *See id.* at 1023-24, 1026-27; *Moyer*, 473 F.3d at 538.

> While [the] expansion of the supplier's responsibility for injuries resulting from defects in his product has placed the supplier in the role of a guarantor of his product's safety, it was not intended to make him an insurer of all injuries caused

by the product . . . . It is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint . . . . A standard suggesting the existence of a "defect" if the article is unreasonably dangerous or not duly safe is inadequate to guide a lay jury in resolving these questions.

*Azzarello*, 391 A.2d at 1024, 1026. Therefore, under Pennsylvania's interpretation of the Restatement (Second), whether or not a product is "unreasonably dangerous" (so that placing the risk of loss on the supplier would be justified) is a question of law. *See id.* at 1026; *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1044 (3d Cir. 1997).

Pennsylvania law provides that a product is "unreasonably dangerous" if its unavoidable dangers outweigh its utility, in light of "the availability of precautions that, though not foolproof, might prevent the injury." *See Phillips*, 841 A.2d at 1013-14 (quoting *Burch v. Sears, Roebuck & Co.*, 467 A.2d 615, 618 (Pa. Super. Ct. 1983)). Consequently, a court, prior to submitting the plaintiff's case to the jury, must conduct a risk-utility (or cost-benefit) analysis. *Id.* If the risks of the product outweigh its utility to the public under the facts alleged, then the suit proceeds to the jury, which will determine if (1) the product is defective because it left the distributor's control lacking any element necessary to make it safe for its intended use or possessing a feature that renders it unsafe for such use and (2) the defect caused the plaintiff's injury. *Surace*, 111 F.3d at 1044 (citing *Azzarello*, 391 A.2d at 1027).

This threshold risk-utility analysis places the trial judge in the difficult, dual role of "social philosopher" and "risk-utility economic analyst." *Surace*, 111 F.3d at 1044.[9] To assist a court in its balancing analysis, the Pennsylvania Supreme Court has provided a list of seven (7)

---

[9] This formulation – a court functioning as a "social philosopher" or a "risk-utility economic analyst" – is one placed on the Court by decades of decisions applying Pennsylvania law. Whether it is a role best given to trial judges is a question resolved by those years of legal precedent. Perhaps it is its ongoing vitality that casts the most significant shadow over the continued application of the Restatement (Second).

factors which should be considered; these are often referred to as the Wade factors.[10] *See, e.g., Surace*, 111 F.3d at 1046 (using the Wade factors to balance the costs and benefits of a road profiler machine); *Van Doren v. Coe Press Equipment Corp.*, 592 F. Supp. 2d 776, 791 (E.D. Pa. 2008) (noting the source of the Wade factors when conducting a risk-utility analysis regarding a straightener machine); *Lancenese v. Vanderlans and Sons, Inc.*, No. 05-CV-5951, 2007 WL 1521121, at *2 (E.D. Pa. 2007) (applying the seven factors in a thorough analysis of industrial, domehead plugs).

The seven Wade factors are: (1) the usefulness and desirability of the product, in other words, its utility to the user and to the public as a whole; (2) the safety aspects of the product, meaning the likelihood that it will cause injury and the probable seriousness of the injury; (3) the availability of a substitute product which would meet the same need and not be as unsafe; (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) the user's ability to avoid danger by the exercise of care in the use of the product; (6) the user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction; and (7) the feasibility, on the part of the manufacturer, of spreading the loss by adjusting the price of the product or carrying liability insurance. *Surace*, 111 F.3d at 1046 (citing multiple Pennsylvania Superior Court cases).

Notably absent from these factors is any reference to negligence concepts. Indeed, the Pennsylvania Supreme Court has repeatedly emphasized that principles such as the reasonableness or foreseeability of a consumer's actions may not be injected into a products

---

[10] This name is derived from the seminal article by John W. Wade, a former dean of Vanderbilt Law School. John W. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 857-58 (1973)).

liability case under Pennsylvania's Restatement (Second) jurisprudence. *Carrecter*, 499 A.2d at 330 (citing *Berkebile*, 337 A.2d at 900). *See also Phillips*, 841 A.2d at 1007. Thus, this Court cannot consider a consumer's alleged comparative negligence or the reasonableness of a manufacturer's decision to design a product in a particular manner. *Kimco Dev. Corp. v. Michael D's Carpet Outlets*, 637 A.2d 603, 605-06 (Pa. 1993); *Carracter*, 499 A.2d at 330-31. Regarding the latter, this means that the Court should not consider a manufacturer's decision to comport its product's design to prevailing industry standards during the Court's risk-utility analysis.

> [I]ndustry standards relating to the design of [a product], and evidence of its widespread use in the industry, go to the reasonableness of the [manufacturer's] conduct in making its design choice. . . . [S]uch evidence would have improperly brought into the case concepts of negligence law.

*Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.*, 528 A.2d 590, 594 (Pa. 1987). *See also Spino v. John S. Tilley Ladder Co.*, 696 A.2d 1169, 1172 (Pa. 1997) ("Evidence of due care by a defendant is both irrelevant and inadmissible in a products liability case since a manufacturer may be strictly liable even if it used utmost care."); *Carrecter*, 499 A.2d at 329 ("The difficulty with the latter portion of the charge inviting a jury to consider the 'state of the art' is that it injects negligence into a products liability case.").

In light of these constructs springing from Pennsylvania's interpretation of the Restatement (Second), the Court now turns to the question of whether the Stockpicker is "unreasonably dangerous" when measured against the facts as set forth in the record. When making its determination by applying the Wade factors, the Court reviews the facts in a manner most favorable to the Sansoms and draws all justifiable inferences their favor. *Warnick v. NMC-Wollard, Inc.*, 512 F. Supp. 2d 318, 324 (W.D. Pa. 2007); *Omnipoint Comm. Enter., L.P.*, 219 F.3d at 242 (citing *Anderson*, 477 U.S. at 255). The Court must decide "whether the evidence is

sufficient, for purposes of the threshold risk-utility analysis, to conclude as a matter of law that the product was not unreasonably dangerous, not whether the evidence creates a material fact for the jury." *Warnick*, 512 F. Supp. 2d at 324 (quoting *Surace*, 111 F.3d at 1049 n. 10). The burden of establishing that the product here, the Stockpicker, is not unreasonably dangerous falls on the manufacturer, Crown. *Id.* In its analysis and application of the Wade factors, the Court must also keep in mind the purpose of the product, because determining a product's intended purpose is "critical to the court's legal conclusions about whether the product can be deemed defective." *Id.* at 325 (quoting *Schindler v. Sofamore, Inc.*, 774 A.2d 765, 773 (Pa. Super. Ct. 2001)).

1)   THE USEFULNESS AND DESIRABILITY OF THE STOCKPICKER

It is plain that the Stockpicker is a useful product. This vehicle's purpose is to allow its operator, such as a warehouse employee, to access and, if needed, retrieve inventory stored above the operator's physical reach. Crown and the Sansoms acknowledge the Stockpicker's utility, and this factor accordingly weighs in favor of Crown.

2)   THE STOCKPICKER'S SAFETY ASPECTS, MEANING THE LIKELIHOOD THAT IT WILL CAUSE INJURY AND THE PROBABLE SERIOUSNESS OF THE INJURY

To determine the likelihood and seriousness of injury resulting from a product's use, courts should consider the safety aspects of the product when it was marketed, not its condition immediately prior to the accident. *Kagan v. Harley Davidson, Inc.*, No. 07-0694, 2008 WL 3874824, at *7 (E.D. Pa. Aug 20, 2008) (citing *Surace*, 111 F.3d at 1053). Even if, as marketed, the probability of injury is low, this factor may still weigh in the plaintiff's favor when the type of injury likely to result from an accident would be severe or possibly fatal. *See Surace*, 111 F.3d at 1048 (holding that the district court incorrectly determined that there was not a "sufficiently grave risk of harm" from a road profiler machine which caused injures only from

"time to time" because the injuries were likely to be serious due to the "immensity and huge weight of the machine"); *Van Doren*, 592 F. Supp. 2d at 791-92 ("Given the large size and high power of the machine and the fact that there was no emergency off-switch near the nip point, the injury, when it occurred, would likely be grave. . . . We find that the risk and potential gravity of the injury involved in this case weighs in favor of finding the product defective under the second Wade factor.")

At the time of sale in 1997, the Stockpicker's standard safety features included foldable guardrails on two, parallel sides of the platform and a safety belt with an eight (8) foot lanyard that would fit a 36 to 44-inch waist. Defs.' Stat. Facts ¶¶ 8, 11, 17; Pls.' Stat. Facts ¶¶ 8, 11, 90. Additional belt sizes and various configurations, such as harnesses or self-retracting lanyards, were available upon the consumer's request. Defs.' Stat. Facts ¶¶ 10, 28; Pls.' Stat. Facts ¶¶ 26-28. A prominently posted warning sign instructed the operator to wear the safety belt to minimize the risk of injury from a fall. Defs.' Stat. Facts ¶¶ 19-20; Pls.' Stat. Facts ¶¶ 18-22.[11]

Regarding the likelihood of injury given these safety features, Crown produced reports of 125 accidents involving the subject Stockpicker that occurred between 1990 and 2007. Included in these reports are instances of operator fatalities, as well as, operator's suffering skull fractures, back injuries, and broken bones. Pls.' Stat. Facts ¶¶ 107-08; Defs.' Resp. Facts ¶ 108. Crown argues that the total number of accidents is statistically insignificant given the twenty-seven year

---

[11] The Court notes that, of these safety features, Crown actually argues that its belt and tether system alone is adequate to protect Stockpicker operators from serious injury, meaning the second Wade Factor should weigh in its favor. In fact, Steven McDermitt, Crown's project coordinator for industry standards, emphasized in his deposition that Crown relied solely upon its tether system to protect Stockpicker operators from injury; the company did not consider the platform guardrails a fall-protection safety feature. Dep. of Steven McDermitt, 38: 17-21, 40:18-19, ECF No. 70-1. Mr. McDermitt stated that "we [Crown] supply the truck with a belt and tether because we feel that is the best method to protect the operator from a fall." *Id.* at 38: 19-21. He later reiterated "[b]ut again, we [Crown] are not relying on that guardrail as fall protection for the operator." *Id.* at 40:18-19. Since the Court must, under the Restatement (Second), focus on the actual state of the product at the time it was marketed and not consider the distributor's subjective reasons for selecting a particular design to avoid running afoul of the bar on considering negligence concepts, the Court will decline Crown's invitation to, in essence, consider the Stockpicker's guardrails as mere ornamentation.

time span, and, furthermore, misleading in that many of the accidents occurred when the operator was not wearing the safety belt. The Sansoms, of course, disagree. Despite this dispute regarding the accident data's statistical significance, the Court finds that the seriousness of the injury that can occur even when an operator is wearing the safety belt and tether tips the scale in favor of the Sansoms on the issue of the Stockpicker's current safety features.

As explained by Mr. Wharton, "[b]ody belts are suitable for positioning, not fall protection. An example of positioning is restraining workers from approaching unprotected edges of elevated surfaces." Wharton Supplemental Ex. Rep. 2, ECF No. 70-3. The reason for this unsuitability is that severe injury can still occur even when an operator properly utilizes the belt and lanyard. First, an operator falling through the open end of the platform can forcefully impact with warehouse shelving or the Stockpicker itself as he or she swings on the end of eight (8) foot tether. Second, the lanyard may be insufficient to stop the force of an operator's fall and therefore fail, resulting in the operator falling the full distance from the Stockpicker's platform, which can reach a height of thirty (30) feet, and striking the ground. Crown reported instances where the latch that connects the lanyard to the mast failed. Wharton Prelim. Ex. Rep. ¶ 27, ECF No. 70-2. Third, the belt itself can actually cause injury. In an accident similar to Mr. Sansom's here, an operator fell from a Crown lift after a second Crown lift struck her vehicle. Wharton Supplemental Ex. Rep. 4, ECF No. 70-13. The injuries she sustained to her abdomen and pelvis were caused by the safety belt. *Id.* Fourth and finally, due to the lack of any type of gating between the platform and load pallet, an operator in the course of a fall can suffer injury by crashing into the pallet (and any items resting upon it) prior to exiting the Stockpicker completely and reaching the tethers' full extent. Mr. Sansom's flight path illustrates this possibility as he impacted with the load pallet first before rolling over its edge and landing on the

floor. Even if Mr. Sansom had received the benefit of the eight (8) foot lanyard, his primary contact with the load pallet would still have occurred because the pallet and fork array attaches directly to the load end of the operator's platform and the platform is only two and a quarter (2.25) feet deep. While the probability of these events may be statistically low, as Crown alleges, the likelihood that serious injury or even death will result from an operator's body forcefully striking nearby shelving, the Stockpicker, the load pallet, or the floor tip the scales in the Sansoms' favor when weighing the Stockpicker's safety features.

3) THE AVAILABILITY OF A SUBSTITUTE PRODUCT WHICH WOULD MEET THE SAME NEED AND NOT BE AS UNSAFE.

This factor requires the Court to consider the availability of a substitute vehicle that would meet the same need as the Stockpicker. *Kagan*, 2008 WL 3874824, at *9. The "proposed alternative design" must be "safer overall" when compared to the Stockpicker. *Id.* (internal quotations omitted). Accordingly, the third Wade factor weighs heavily in favor of the Sansoms because, as discussed in the Court's Restatement (Third) analysis, Crown already distributes a stockpicker that conforms to an alternative design, and this design addresses the particular safety deficiency of the Stockpicker before the Court: its open, un-gated load end.

Again, Crown does not dispute that it has manufactured and sold the European design for several decades but rather advances several arguments that go to the reasonableness of their decision to decline to equip the subject Stockpicker with a rear gate, such as the difference between European and United States industry standards and the possibly of the gate providing a false sense of security to operators. Under Pennsylvania's interpretation of the Restatement (Second), the Court cannot consider these negligence-infused arguments in its risk-utility analysis.

The Court also does not find Crown's argument convincing that the rear gate would hinder the functionality of the Stockpicker because such a gate would restrict an operator's access to the load pallet. To that end, Mr. Wharton examined "a North American truck to which rear gates had been added for shipment to Australia." Wharton Prelim. Ex. Rep. 12-13, ECF No. 70-2. The rear gates on this model were hinged, allowing the operator to raise the gates and access the load pallet. *Id.* This modified stockpicker also possessed a belt and lanyard attachment, meaning that if the operator needed to step outside of the gated platform, the tether system would still provide a measure of fall protection. *See id.* Crown's ability to modify an existing American-model stockpicker by adding hinged rear gates for its Australian customers belies any contention that a substitute design is unavailable to meet the needs of its American consumers. As the rear-gated design of the Australian and European models is also safer overall, the third Wade Factor plainly falls in favor of the Sansoms.

4) THE MANUFACTURER'S ABILITY TO ELIMINATE THE UNSAFE CHARACTER OF THE PRODUCT WITHOUT IMPAIRING ITS USEFULNESS OR MAKING IT TOO EXPENSIVE TO MAINTAIN ITS UTILITY.

The fourth Wade Factor does not mandate that a manufacturer design a "foolproof" product. *Surace*, 111 F.3d at 1050 (quoting *Burch*, 467 A.2d at 618). However, when the manufacturer could produce a safer product without impairing the product's usefulness or rendering it cost prohibitive, this factor weighs in the plaintiff's favor. *See id.* (holding that the district court erred in determining that a road profiler was not unreasonably dangerous in part because the manufacturer could improve the machine's safety aspects); *Lancenese*, 2007 WL 1521121, at *3 (determining that this factor fell in favor of the plaintiff since the defendant manufacturer could "to a certain degree, eliminate the unsafe character of the product . . . ."). As discussed above, Crown already designs, builds, and sells a functional European stockpicker

with a fully enclosed platform and has the ability to modify an existing American stockpicker for a customer so that it possesses a hinged rear gate (the Australian model). Crown's proven ability to produce and market a safer stockpicker that maintains its utility for its intended purpose causes this factor to weigh forcefully in the Sansoms' favor.

5) THE USER'S ABILITY TO AVOID DANGER BY THE EXERCISE OF CARE IN THE USE OF THE PRODUCT

This part of the risk-utility analysis constitutes an "objective inquiry into whether the class of ordinary purchasers of a product could avoid injury though the exercise of care in use of the product." *Surace*, 111 F.3d at 1051. Operators of the Stockpicker can reduce their exposure to the dangers of a fall from the platform through use of the provided belt and lanyard and driving the vehicle in a careful fashion. But even when exercising such due care, an operator's control over his or her safety while using the Stockpicker is limited, given the problems previously articulated by the Court regarding ~~with~~ the tether system and the very purpose of the Stockpicker itself, which is to lift its users to a maximum height of thirty (30) feet. Therefore, the Court holds that this factor, read in the light most favorable to the non-movants, the Sansoms, tips slightly in their favor.

6) THE USER'S ANTICIPATED AWARENESS OF THE DANGERS INHERENT IN THE PRODUCT AND THEIR AVOIDABILITY, BECAUSE OF GENERAL PUBLIC KNOWLEDGE OF THE OBVIOUS CONDITION OF THE PRODUCT, OR OF THE EXISTENCE OF SUITABLE WARNINGS OR INSTRUCTION

Even if a product's dangers are common knowledge, this factor may weigh in favor of the plaintiff if the manufacturer did not take steps to eliminate the danger. As the Third Circuit in *Surace*, quoting Dean Wade, noted:

> [T]he dangers of a hoe or an axe are both matters of common knowledge and fully apparent to the user. But it is not necessarily sufficient to render a product duly safe that its dangers are obvious, especially if the dangerous condition could have been eliminated. A rotary lawn mower,

> for example, which had no housing to protect a user from the whirling
> blade would not be treated as duly safe, despite the obvious character of
> the danger.

111 F.3d at 1052. The dangers of a product can also be presented to the consumer through
proper warnings or instructions, and the presence of such documentation may tip the risk-utility
scales toward the manufacturer. *See Kagan*, 2008 WL 3874824, at *12 (explaining that this
factor weighed in Defendant Harley Davidson's favor because the manufacturer included
sufficient warnings and instructions regarding the use of its motorcycle and kickstand).

The parties do not dispute that Crown placed prominent warning signs on the
Stockpicker, which cautioned operators about the risks of serious injury resulting from a fall
from the vehicle, nor do they dispute that the danger of a fall from an elevated height would be
obvious to the Stockpicker's users. However, Crown's Stockpicker design leaves its users
exposed and unprotected from a fall on an entire side of the platform, the load end, even when
they are wearing the safety belt and aware of all warnings. The Court accordingly finds that
Crown has not addressed the obvious danger of falling through the un-gated end of the platform,
meaning this factor tips in favor of the Sansoms.

7) THE FEASIBILITY, ON THE PART OF THE MANUFACTURER, OF SPREADING THE LOSS BY
ADJUSTING THE PRICE OF THE PRODUCT OR CARRYING LIABILITY INSURANCE

The last Wade Factor addresses a manufacturer's ability to spread the economic loss it
occurs due to an accident by adjusting the product's price or carrying liability insurance. *Van
Doren*, 592 F. Supp. at 793-94; *Kagan*, 2008 WL 3874824, at *12. "Although a manufacturer is
usually able to spread the cost of a plaintiff's loss to all consumers of a product by raising the
price of the product, the feasibility of doing so depends upon balancing the remaining factors in
the risk/utility analysis." *Lancenese*, 2007 WL 1521121, at *4-5. As the majority of the Wade

factors weigh in favor of the Sansoms, it follows that Crown should bear the responsibility of spreading losses incurred from Stockpicker accidents.

D.   *A GENUINE ISSUE OF MATERIAL FACTS EXISTS REGARDING THE CAUSE OF MR. SANSOM'S INJURY*

Even though the Court finds that Crown should be subject to strict liability under the principles of either Restatement, the question remains as to whether the Stockpicker's defect was the cause of Mr. Sansom's injury. *See Warnick*, 512 F. Supp. 2d at 329 ("[A] defendant's burden of proof at the risk-analysis inquiry is analytically distinct from, and independent of, a plaintiff's burden of proving the remaining elements of a design defect claim, including causation.") Crown moves for summary judgment on the issue of causation by asserting that Mr. Sansom assumed the risk of his injury. In a strict products liability action, "Pennsylvania courts allow defendants to introduce evidence of a plaintiff's voluntary assumption of the risk. . . insofar as it relates to the element of causation. *Barnes v. American Tobacco Co.*, 161 F.3d 127, 148 (3d Cir. 1998).

Assumption of the risk, however, is typically a question of fact that falls within the purview of the jury because it requires a factual analysis of the plaintiff's subjective understanding of the risks involved. *Surace*, 111 F.3d at 1054. This defense may not even be available to the distributor when the plaintiff's employment requires him to use the allegedly defective product. *Jara v. Rexworks, Inc.*, 718 A.2d 788, 795 (Pa. Super. Ct. 1998). "[W]here an employee, in doing his job, is required to use equipment in the course of his employment and as directed by the employer, [the employee] has no choice in encountering the risk inherent in that equipment." *Id.* Absent a voluntary encounter with the allegedly defective product, an employee cannot be said to have assumed the risk. *Staub v. Toy Factory, Inc.*, 749 A.2d 522, 530 (Pa. Super. Ct. 2000).

Here, a jury could conclude from the evidence that Mr. Sansom was required by Great Lakes Storage to use the Stockpicker as a condition of his employment. The jury could further find that Mr. Sansom was forced to use the Stockpicker without the safety belt, as he claims that a belt which would fit over his work uniform was not available. The factfinder could also determine that Mr. Sansom did not understand the risks of operating the Stockpicker without a safety belt because the record reflects an employee culture at Great Lakes Storage of repeatedly foregoing the use of the Stockpicker's tether system due to their bulky clothing. Most critically, however, is the reality that the jury could rationally conclude that the actual cause in fact of Mr. Sansom's injuries was the defective nature of the Stockpicker, and not his own behavior. Finally, there would appear to be an inherent contradiction in Crown arguing, as it does, that the Stockpicker is not defective at all as a matter of law but also then contending that its defects are so open and notorious that Mr. Sansom's own voluntary assumption of them made his conduct the operative cause of his injuries. Given these factual issues, granting summary judgment in Crown's favor due to a lack of causation would be inappropriate.

## IV.   CONCLUSION

For the foregoing reasons, Crown's Motion for Summary Judgment is denied. An appropriate order will enter.

Mark R. Hornak
United States District Judge

Dated: 7-24-12

cc: All Counsel of Record